Terry **NELSON**, Appellant,

v.

Michael J. **SCHANZER**, Appellee.

No. A14–88–1006–CV.

Court of Appeals of Texas, Houston (14th Dist.).

March 15, 1990.

Rehearing Denied April 19, 1990.

Leonard J. Meyer, Michael Maness, Houston, for appellant.

Andrea N. Moore, Houston, for appellee.

Before J. CURTISS BROWN, C.J., and JUNELL and MURPHY, JJ.

## OPINION

JUNELL, Justice.

Michael J. Schanzer (Schanzer or appellee) recovered a money judgment against Terry Nelson (Nelson or appellant) under the Deceptive Trade Practices—Consumer Protection Act, ("DTPA"), TEX.BUS. & COM. CODE ANN. § 17.41 et seq. In seven points of error appellant contends: (1) recovery was barred by limitations; (2) Schanzer was not a "consumer" under DTPA; (3) Nelson's conduct was not a "producing cause" of damages; (4) there was no conversion of property by Nelson; (5) no contract of bailment existed between the parties; (6) no grounds exist for attributing corporate liability to Nelson; and (7) admission of evidence of attorney's fees was improper. We modify and affirm.

Schanzer was noticed for eviction by his landlord due to nonpayment of rent. Returning home on the morning of May 14, 1982, he found two deputy constables with Nelson and three other employees of Allied Transfer & Storage, Inc. ("Allied") removing his personal effects to a warehouse under a court order resulting from a forcible entry and detainer action.

Schanzer testified that the handling and packaging of his property was carelessly inappropriate for the nature of that property, which included not only household goods, clothing, and firearms, but also numerous objects of art such as antiques, bronzes, ceramics, china, crystal, glass, oriental rugs, paintings, photographs, porcelain, and pottery. Schanzer said he was assured by Nelson that the movers knew what they were doing.

. On June 3, 1982, Schanzer received a certified letter from Allied[1] announcing that a public auction would be advertised and his property sold on June 14, 1982, unless accumulated storage fees were remitted by 11:00 a.m. ten days after receipt of the letter. This letter notification said the auction would be "in accordance to warehousemans lien law" [sic], and:

"PURSUANT TO THE PROVISIONS OF SECTION 7,209 and 7,210 of the uniform commercial code, V.T.C.A. Bus. & Vol.3" [sic].

The notice contained no time or place for

---

1. The letter also contained a statement of rates and charges for loading, unloading and storage of Schanzer's property.

the auction.[2] A publisher's affidavit shows the June 14 sale was advertised on June 1st and 8th, 1982. Both the advertisement and the notice to Schanzer state, improperly, that the name of the property owner was "M.J. Sancherz".

Schanzer phoned Allied to learn the aggregate amount he owed for packing, transportation and storage. He was told that an auction would be held on the Allied premises at 11:00 a.m. on June 14, 1982. At approximately 9:30 a.m. on June 14, Schanzer appeared at the Allied premises carrying the required amount of money. The Allied clerk said that Nelson had already conducted the sale earlier that morning. That evening Nelson told Schanzer that only a few pieces had been taken away by a "little old couple" who bought Schanzer's property, and that if Schanzer would pay cash for *all* the storage and transfer charges, only "the leather sofa, two bronze statues and a shotgun" would be retained by the purchaser. The next day, June 15, 1982, Schanzer tendered $2,950 in currency and was granted access to what he expected to be the remainder of his property.

While recovering his property Schanzer noticed that five or six of his oriental rugs were missing, as well as a stove, refrigerator, and table saw. A friend helped Schanzer remove his property from the warehouse on a rented truck. The friend testified that during the five or six hours it took to complete the task he observed no broken articles. The friend also testified that the Allied warehouse manager said there had been a recent burglary but he thought the missing property could have been misplaced in another area of the building. The warehouse manager told Schanzer that it would be necessary to talk to Nelson about the missing property, but that Nelson was not then on the premises. The friend said he expected to go back to the warehouse at a later date to pick up more of Schanzer's property when it was found. On June 16, Schanzer began unpacking the boxes containing his goods. He discovered broken items in the boxes previously packed by Allied. The next day, June 17, Schanzer contacted Nelson, who said he would check with Allied's insurance carrier and report back to Schanzer. Nelson then also told Schanzer that police and insurance reports had been made of the recent burglary of the warehouse. A police report in the record shows the warehouse was broken into approximately May 18, 1982. Allied's insurance claim is also in the record. It shows certain of Schanzer's property was "taken from Allied warehouse." Nelson admitted he made the insurance claim and a police report which also listed certain of Schanzer's property taken during a general break-in of the warehouse.[3] Nelson never did get back to Schanzer on the missing or damaged items, nor did he return "numerous" phone calls from Schanzer.

Schanzer valued the missing and damaged property at $64,265.00. Another witness, familiar with Schanzer's possessions and their value, testified that certain individual replacement values which Schanzer had put on the damaged or missing goods were low but that most of them were "fair". An expert witness for the defense testified the values listed by Schanzer were too high.

Nelson, who drew a salary as president and general manager of Allied, said he made all the decisions for the corporation. He also was sole owner of the stock of the corporation, the sole director, and its registered agent. His wife, a full time bank officer, was secretary of the corporation. Sometimes she used her maiden name when signing corporate documents. The

---

**2.** Tex.Bus. & Com.Code Ann. § 7.210 provides that notice to the owner of the goods must include the time and place of public sale. Two weekly publications in a newspaper of general circulation must follow the ten-day notice to the owner. A sale then may be held no earlier than fifteen days after the date of the first publication. The warehouseman is liable for damages for failure to comply with these requirements for sale, and is liable for conversion for willful violation.

**3.** Nelson suspected it was an "inside job" because his employees all quit when he proposed having them take a polygraph.

initial $1,000 of Allied's capitalization was paid by Nelson's contribution of used office equipment and supplies. All such Allied property was subsequently transferred to "Family Bargain Store" (in which Nelson was a shareholder) and leased back to Allied. There were no corporate proceedings to support those latter transactions. Nelson said there were written leases between Nelson or Family Bargain Store and Allied for the equipment used by Allied. None were produced at trial. Allied went into bankruptcy in 1984 with no tangible assets. Allied stopped doing business because of the number of lawsuits brought against it, some of them for breakage and loss of items stored. Allied's sole source of business was the Harris County Constable's office for move-out on detainer actions, such as the packing and storage of Schanzer's goods. Allied did approximately 30 such constable moves each month. When Allied ceased operations, Nelson went to work for "Allied Movers, Inc.", and "Allied Commercial Movers" in the same rented premises which had been occupied by Allied, "... at the very same time that I stopped doing business as Allied Transfer & Storage, Inc." Nelson owned 100% of the stock of Allied Movers, Inc., and was sole director and officer. That corporation went into bankruptcy in 1985. Nelson testified he did not know if Allied Transfer & Storage, Inc. was still an active corporation or if it had been "resolved" [sic] or "dissolved" by the State of Texas. The premises used by Allied were leased by Nelson, individually, from a third party. Nelson in turn subleased the premises to Allied by a written lease which was "lost in the shuffle somewhere", according to him. There was no lease termination notice given by Nelson to Allied upon his re-sublease of the premises to the new corporate tenant, Allied Movers, Inc.

When questioned about the billing for Allied's services to Schanzer, Nelson testified there was possibly an error resulting in an overcharge for the time of the Allied moving crew. Nelson admitted he had no idea of what sections 7.209 and 7.210 of the UCC said or meant. When asked if he ever felt it was rather dangerous not to be aware of laws he should know, he answered, "Not until now."

Nelson testified that the sale of Schanzer's goods took place at 11:00 a.m. and that Schanzer showed up at 11:30. He said he deposited Schanzer's $2,950 into the bank but he couldn't produce any bank records. At the auction of Schanzer's goods, Nelson told the "little old couple" what the minimum required bid should be. That couple, whose identity was unknown, were the only people at the auction. The "little old couple" paid cash for their purchase. Nelson gave them no receipt. The court admonished that any such cash "... had best show up in that corporation bank account otherwise, it is going to be serious relative to the individual's liability." This was followed by:

COURT: If I understand your testimony, and I want to be absolutely certain, that I am being fair, you testified that the little old lady or the little old couple paid $2905 cash on June 14th, 1982 when you conducted the auction; is that correct?

NELSON: Yes.

COURT: What did you do with the $2905 cash paid to you by those people?

NELSON: I deposited that, I don't know if it was in the next day or later in the week.

COURT: But, you ultimately got it into the bank, all of it?

NELSON: Yes, sir.

Photocopies of bank records for the three month period ending August 1982, were obtained by subpoena and admitted into evidence. These records do not show the deposit of cash receipts as described by Nelson in his testimony. Further, the bank records show that Nelson used corporate funds for monthly payments on his personal bank loan, the proceeds of which had been used to capitalize the corporation. Corporate checks also were drawn to repay loans on rolling stock owned by Nelson, individually, as well as for the license fees, repairs and maintenance of such equipment, and for rent on the warehouse leased by Nelson from a third party. There were numerous checks drawn to the order of

Nelson for which there was no accounting on the face of the check nor by his testimony at trial. Checks had been drawn to pay other of Nelson's personal bills as well.

Suit was filed by Schanzer against Allied on October 14, 1982. Nelson was added as a defendant on June 18, 1984. A citation naming Nelson was issued August 24, 1984. The constable's notation on the face of the citation shows Nelson was served on September 10, 1984.

Allied was in bankruptcy at the time of trial. The trial court approved a settlement between Schanzer and Allied under which $10,000 was paid to Schanzer, being the amount of Allied's insurance proceeds which were authorized for use by the bankruptcy court. Allied was non-suited.

There was a bench trial in October, 1987, with additional testimony heard in December, 1987, when the bank records became available after their subpoena. The record contains forty-one findings of fact, and twenty conclusions of law. Pertinent parts of the judgment are as follows:

> The Court, after considering the evidence and arguments of counsel, finds that the Defendant, TERRY R. NELSON, knowingly and intentionally committed false, misleading and deceptive acts and practices against the Plaintiff and also intentionally participated in fraudulent acts. The Court, disregarding the corporate fiction, further finds that Defendant, TERRY R. NELSON committed conversion when he willfully failed to comply with § 7.210 Uniform Commercial Code and that said Defendant also breached the contract of bailment.
>
> Accordingly, the Court finds that the Plaintiff, MICHAEL J. SCHANZER, should recover from the Defendant, TERRY R. NELSON, actual damages of THIRTY-SIX THOUSAND NINE HUNDRED THIRTY-FIVE and 75/100 DOLLARS ($36,935.75) with prejudgment interest thereon at the highest legal rate per annum from June 15, 1982 until the date of judgment together [sic], reasonable and necessary attorney's fees of TWELVE THOUSAND NINE HUNDRED NINETY and NO/100 DOLLARS ($12,990.00), post judgment interest of

> ten percent (10%) per annum from the date of judgment until paid in full and costs of Court.
>
> \*   \*   \*   \*   \*   \*
>
> It is therefore ORDERED, ADJUDGED and DECREED that Plaintiff, MICHAEL J. SCHANZER, do have and recover from the Defendant, TERRY R. NELSON, the sum of FORTY NINE THOUSAND NINE HUNDRED TWENTY FIVE and 75/100 DOLLARS ($49,925.75), which sum represents actual damages for deceptive trade practices, mental anguish, statutory exemplary damages, prejudgment interest and reasonable and necessary attorney's fees together with post judgment interest on the total judgment at the rate of ten percent (10%) per annum calculated from the date of entry of judgment until paid in full.
>
> It is further ORDERED that Plaintiff be awarded conditional attorney's fees of TEN THOUSAND and NO/100 DOLLARS ($10,000.00) in the event of an appeal to the Court of Appeals and an additional TEN THOUSAND and NO/100 DOLLARS ($10,000.00) in the event of an appeal to the Supreme Court of Texas and that the costs of Court be adjudged against the Defendant, TERRY R. NELSON, for which let execution issue if not timely paid.

■ The court below disregarded the corporate fiction on the basis of alter ego. This is not an unreasonable finding or an abuse of discretion, given the evidence in the record. Alter ego applies when there is such unity between corporation and individual that the separateness of the corporation has ceased and holding only the corporation liable would result in injustice. *Castleberry v. Branscum*, 721 S.W.2d 270, 272 (Tex.1986), (other citations omitted). Alter ego is shown from the total dealings of the corporation and the individual, including the degree to which corporate formalities have been followed and corporate and individual property have been kept separately, the amount of financial interest, ownership and control the individual maintains over the corporation, and whether the

corporation has been used for personal purposes. *Id.* Alter ego's rationale is: "if the shareholders themselves disregard the separation of the corporate enterprise, the law will also disregard it so far as necessary to protect individual and corporate creditors." *Id.* As a preamble to our review of the points of error, we hold that a finding of alter ego by the court below was appropriate.

Nelson complains in his first point of error that the action against him was barred by limitations due to his having been named as a party more than two years after the cause of action arose. Nelson further asserts a lack of due diligence, as a matter of law, in the issuance and service of citation upon him after he was named, using as authority the holding of this court in *Williams v. Houston–Citizens Bank and Trust Co.*, 531 S.W.2d 434, 435–36 (Tex.Civ.App.—Houston [14th Dist.] 1975, writ ref'd n.r.e.).

■ It is undisputed that Schanzer's suit against Allied was timely and properly filed. Nelson, the only officer qualifying for service as well as the corporation's registered agent, was undoubtedly served with the citation on the original petition against Allied, and therefore he had notice. We hold that the filing against the alter ego, Allied, tolled the running of limitations against Nelson, the owner of Allied. *American Petrofina Co. of Texas v. Crump Business Forms, Inc.*, 597 S.W.2d 467, 472 (Tex.Civ.App.—Dallas 1980, writ ref'd n.r.e.); *Gentry v. Credit Plan Corp.*, 528 S.W.2d 571 (Tex.1975). We realize the cases cited involve only a corporate ownership by other corporate entities. But we find no reason for a different rule where the alter ego corporation is owned by an individual. *Arguendo*, if our finding is erroneous, there is evidence to show that Schanzer discovered his damaged property on June 16, 1982, and that he learned even later that certain of his missing property would never be returned to him. The court below made a finding that Schanzer became aware of fraudulent acts, misrepresentations and deceptive trade practices of Nelson, individually and as agent for Allied, on June 16, 1982. Using a two-year statute, Nelson should have been joined by June 16, 1984. We take judicial notice that June 16, 1984, was a Saturday and find that the filing actually made on Monday June 18, 1984, satisfied any applicable two-year limitation.

■ Under our holding in *Williams v. Houston–Citizens Bank and Trust Co.*, 531 S.W.2d 434, Nelson had the burden of proving from the record that a citation in fact was unduly delayed before the burden of explaining any such undue delay shifts to Schanzer. Nelson has failed to show that the citation issued August 24, 1985, was the only citation ever issued by the clerk in the name of Nelson and therefore he fails in his burden. Appellant's first point of error is overruled.

The gist of appellant's second point of error is that Schanzer had no standing to bring suit under section 17.50 of the DTPA because he was not a "consumer" within the meaning of section 17.45(4) of the Act. Appellant cites *Stagner v. Friendswood Development Co., Inc.*, 613 S.W.2d 793 (Tex.Civ.App.—Beaumont 1981), *modified on other grounds*, 620 S.W.2d 103 (Tex. 1981), and *Melody Home Mfg. Co. v. Barnes*, 741 S.W.2d 349 (Tex.1987), for the proposition that the services must be the basis of the complaint and those services must have been intended to flow directly from Nelson to the complaining Schanzer. The argument presented is that Allied served as agent for the constable and that Schanzer's payment to Allied of $2,950 was for neither the purchase of goods or services, and that claims of loss or destruction of property did not arise from "acquisition" of "goods or services by purchase or lease" from Allied or Nelson. Further, Nelson argues that even if a purchase of Allied services properly could have been construed by the court below, the measure of damages must be confined to the $2,950 paid by Schanzer to Allied.

■ The services of Allied were undoubtedly "acquired", thus creating a purchaser who would meet the definition of "consumer" under the TEX.BUS. & COM.CODE ANN. § 17.45(4). It is a reasonable infer-

ence that Schanzer became such a consumer upon his involuntarily becoming a bailor under due process and operation of law, evidenced by the court order the constable was executing. The constable acting under a court order related to forcible entry and detainer is in the same position as any peace officer disposing of property under a writ of execution. He is agent for the debtor (having a duty to secure best results for both debtor and creditor). *Wagner v. Hudler*, 218 S.W. 100, 109 (Tex.Civ.App.— San Antonio 1920, no writ). For a bailment to exist, there normally must be a contract, express or implied, delivery of the property to the bailee, and acceptance of the property by that bailee. *Sanroc Co. Int'l v. Roadrunner Transp., Inc.*, 596 S.W.2d 320 (Tex.Civ.App.—Houston [1st Dist.] 1980, no writ). The law empowered the constable to make such a contract with the bailee, Allied, on behalf of Schanzer, bailor. A contract of bailment may arise by implication of law if the implied relationship of bailor and bailee is shown to rest upon substantive foundation. *Sanroc Co. Int'l v. Roadrunner Transp., Inc.*, at 322; *Shamrock Hilton Hotel v. Caranas*, 488 S.W.2d 151 (Tex.Civ.App.—Houston [14th Dist.] 1972, writ ref'd n.r.e.). There was at least constructive delivery of Schanzer's goods along with an express acceptance thereof by the bailee, Allied. (On this basis we overrule point of error number five where Nelson would have us find there was no contract of bailment, express or implied, between the parties.).

The law on any issue of privity required between the consumer and the person in violation of DTPA is clear (Italics added):

Consumer is defined in section 17.45(4) only in terms of a person's relationship to a *transaction* in goods or services. It does *not* purport to define a consumer in terms of a *person's relationship* to the party he is suing. Section 17.45(4) does nothing more than describe the class of persons who can bring a suit *for treble damages* under section 17.50.[4] *Riverside National Bank v. Lewis*, [603

S.W.2d 169, 173 (Tex.1980)]. It does not say who a consumer can sue under section 17.50 for a deceptive trade practice violation.

*Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 541 (Tex.1981). *See also Flenniken v. Longview Bank and Trust Co.*, 661 S.W.2d 705 (Tex.1983); *Stagner v. Friendswood Development Co., Inc.*, 620 S.W.2d 103 (Tex.1981).

■ The legislature has directed that the DTPA "shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty and to provide efficient and economical procedures to secure such protection." TEX.BUS. & COM.CODE ANN. § 17.44. *See Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d at 540. The court below properly found that Schanzer was a consumer of services of Allied within the meaning of the DTPA. With respect to damages, the DTPA permits recovery of the greatest amount of actual damages alleged and factually established to have been caused by the deceptive practice. *Kish v. Van Note*, 692 S.W.2d 463, 466 (Tex.1985). The court below found, *inter alia*, that Nelson, acting individually and as agent for Allied, knowingly and intentionally acted in an unconscionable manner *and* that he knowingly and intentionally sold Schanzer's goods at auction prior to a properly noticed sale. The court found actual damages of $36,935.75, and also found that same amount was the value of the goods when they were converted by Nelson on June 14, 1982. These findings would give rise to actual damages for unconscionable acts under DTPA resulting from the broken and missing property of Schanzer under TEX.BUS. & COM.CODE ANN. § 17.50, as well as damages for conversion under TEX. BUS. & COM.CODE ANN. § 7.210, related to warehouseman's liability. Therefore, Nelson's allegation of damages being subject only to measurement by the $2,950 paid by

---

4. We note that the court below consciously avoided granting Schanzer any treble or enhanced damages under DTPA section 17.-

50(b)(1) by manually striking from the judgment, prior to signing, a proposed provision for such damages.

Schanzer is without merit. There is no reason for acts of conversion, fraud, misrepresentation or violations of other statutes to be ignored by the DTPA. The laundry list of "false, misleading, or deceptive acts or practices" listed in section 17.-46(b) of the DTPA is not complete, by its own language. Appellant's point of error number two is overruled.

In his third and fourth points of error Nelson argues that his conduct was not a "producing cause of actual damages" as required by section 17.50(a) of the DTPA. Further, Nelson urges there is no evidence that he or Allied knowingly or intentionally converted any property prior to its reclamation by Schanzer on June 15, 1982.

There is evidence that Schanzer's property was missing or stolen, that certain of it was poorly packed, and that there was damage at the time of its recovery by Schanzer. All this proves Allied's failure to return the bailed property in good condition.

We have before us a bailment for mutual benefit as a matter of law because Allied was in business for profit as a bailee of goods such as Schanzer's. *Andrews v. Allen,* 724 S.W.2d 893, 895 (Tex.App.—Austin 1987, no writ); *Shamrock Hilton Hotel v. Caranas,* 488 S.W.2d 151 (Tex.Civ.App.—Houston [14th Dist.] 1972, writ ref'd n.r.e.). In a bailment for mutual benefit, a rebuttable presumption of negligence arises upon proof that the bailed chattel was destroyed or not returned. To overcome this presumption, the bailee has the burden of showing the cause of the accident or that the damage resulted from some other cause consistent with due care on his part. *Andrews v. Allen,* 724 S.W.2d at 896. Failure to adequately rebut the presumption of negligence establishes liability as a matter of law. *See Shamrock Hilton Hotel v. Caranas,* 488 S.W.2d at 153. No adequate rebuttal of the presumption was found by the court below. Appellant's third point of error is overruled.

Appellant's fifth point of error previously has been overruled.

In his sixth point of error Nelson argues no grounds for attributing to him the liability of Allied on DTPA, common law fraud, conversion, and breach of implied contract of bailment. We already have reviewed affirmatively the finding of the court below as to Allied being the alter ego of Nelson. Accordingly, appellant's sixth point of error is overruled.

In his seventh and final point of error appellant argues that it was error for the court below to hear Schanzer's counsel testify on reasonable and necessary attorney's fees which were later awarded by the court. We agree. It is undisputed that counsel failed to list herself as an expert witness on interrogatories and failed to supplement responses to include herself. Such failure to comply must result in exclusion of testimony in the absence of good cause for its admission. TEX.R.CIV.P. 215(5). No such good cause was shown at trial. We find no grounds for allowing fees under TEX.CIV.PRAC. & REM.CODE ANN. §§ 38.003 or 38.004. Those sections do not apply to DTPA awards such as were made in the judgment here. *Smith v. Smith,* 757 S.W.2d 422, 425 (Tex.App.—Dallas 1988, writ denied). Arguably, the judgment also awards damages on claims other than DTPA, but we have no basis for apportionment which might allow a partial award of attorney's fees under TEX.CIV.PRAC. & REM. CODE ANN. § 38.004. Given these circumstances we must follow the mandates of *E.F. Hutton & Co., Inc. v. Youngblood,* 741 S.W.2d 363 (Tex.1987), and *Gutierrez v. Dallas Independent School Dist.,* 729 S.W.2d 691 (Tex.1987), sustain appellant's seventh point of error, and modify the judgment to exclude any and all awards of attorney fees.

As modified, the judgment of the trial court is affirmed.