**Affirmed as Modified and Opinion filed May 28, 2015.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-13-00694-CV

---

**FIRST BANK, Appellant**

**V.**

**DTSG, LTD. AND RICHARD BRUMITT, Appellees**

---

**On Appeal from the 334th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2009-64498**

---

# O P I N I O N

In this lender-liability case, a company that sought to purchase the stock of another company sued a bank alleging the bank failed to provide promised financing for a stock-purchase transaction. Both the company and the owner of the stock asserted various claims against the bank. The jury answered liability and

damages questions in favor of the company and the stockowner based on each claimant's breach-of-contract and negligent-misrepresentation claims, and the trial court rendered judgment on the jury's verdict. On appeal, we conclude that (1) the trial court abused its discretion by allowing the stockowner's lead trial counsel to testify as an expert as to the company's attorney's fees; (2) none of the bank's other arguments challenging the breach-of-contract claims of the company or the stockowner have merit; and (3) the company and the stockowner may not recover under a negligent-misrepresentation claim because, as a matter of law, neither party showed an injury independent from economic losses recoverable under a breach-of-contract claim. Accordingly, we modify the trial court's judgment to delete the award of (a) attorney's fees to the company, and (b) negligent-misrepresentation damages and exemplary damages to the company and the stockholder. We affirm the trial court's judgment as modified.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

In September 2007, Don Oprea, President of DTS Group, LLP approached appellant/defendant First Bank seeking to obtain a United States Small Business Administration ("SBA") loan to provide funds to be used to purchase the stock of two companies from appellee/intervenor Richard Brumitt. Oprea, who had a banking relationship with First Bank, met with Tim Duffy, who was then the president of First Bank's SBA loan group. Later, DTSG[1] decided that it would seek to purchase the stock of only one these companies—Southway Systems, Inc.

---

[1] Appellee/plaintiff DTSG, Ltd., a Texas limited partnership was formed on July 23, 2008, after the occurrence of many of the events on which this suit is based. Nonetheless, DTSG, Ltd. filed this suit as successor in interest to DTS Group, LLP; and the distinction between these entities is not material to our analysis in this opinion. For ease of reference, in this opinion both DTS Group, LLP and DTSG, Ltd are referred to as "DTSG."

According to Oprea, on various occasions, First Bank promised to fund a loan for the purchase of the stock, with the proposed loan amount varying. According to Oprea, Duffy made the promises in oral statements, in emails, and in three commitment letters. First Bank never funded any loan to DTSG. DTSG did not obtain a loan from any other lender nor purchase any of Southway's stock. And, Brumitt never sold the Southway stock.

In October 2009, DTSG sued First Bank asserting various claims, including breach of contract and negligent misrepresentation. Brumitt intervened and asserted various claims against First Bank, including negligent misrepresentation and breach of contract as a third-party beneficiary of the alleged contracts between DTSG and First Bank. Following a trial, the jury answered liability and damages questions in favor of DTSG and Brumitt based on each claimant's breach-of-contract and negligent-misrepresentation claims. The jury also found the amount of reasonable and necessary attorney's fees for DTSG and Brumitt. After finding that the harm to DTSG and Brumitt resulted from First Bank's gross negligence, the jury assessed exemplary damages against First Bank and in favor of DTSG and Brumitt.

The trial court denied First Bank's motion for judgment notwithstanding the verdict and rendered judgment on the jury's verdict, awarding each claimant actual damages and attorney's fees based upon the breach-of-contract claim, actual damages based upon the negligent-misrepresentation claim, and exemplary damages. On appeal, First Bank challenges the legal sufficiency of the evidence supporting various jury findings.

## II. ANALYSIS

When conducting a legal-sufficiency review, we consider the evidence in the

3

light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson,* 168 S.W.3d 802, 823 (Tex. 2005). We must credit favorable evidence if a reasonable jury could and disregard contrary evidence unless a reasonable jury could not. *See id.* at 827. We must determine whether the evidence at trial would enable reasonable and fair-minded people to find the facts at issue. *See id.* The jury is the only judge of witness credibility and the weight to give to testimony. *See id.* at 819.

**A.    Did the trial court err in submitting the question of DTSG's damages to the jury because the evidence of DTSG's damages allegedly should not have been admitted into evidence?**

In its first issue, First Bank asserts the trial court abused its discretion by submitting questions regarding DTSG's damages to the jury because DTSG's evidence of damages was subject to the exclusionary rule contained in Texas Rule of Civil Procedure 193.6(a). *See* Tex. R. Civ. P. 193.6(a). First Bank argues that, because DTSG failed to disclose certain matters that it was required to disclose by applicable discovery rules, the trial court had no discretion except to exclude any evidence of DTSG's damages. First Bank states that it objected during trial to various attempts by DTSG to offer evidence of damages other than evidence of the value of DTSG as of December 31, 2007, and that the trial court sustained various objections by First Bank to evidence regarding DTSG's damages. Though the trial court sustained these objections, First Bank argues that the trial court erroneously rejected its complaints that no question regarding DTSG's damages should be submitted to the jury because evidence of such damages was inadmissible.[2]

---

[2] First Bank states that it obtained a pre-trial ruling granting its motion in limine based on this argument. But, this ruling did not preserve error, nor did it preclude First Bank from waiving its evidentiary objections by failing to object to evidence or testimony during trial. *See In re Toyota*

4

We presume, without deciding, the following: (1) First Bank preserved error regarding these complaints;[3] (2) upon timely objection, the trial court should have excluded all evidence of DTSG's damages due to DTSG's failure to comply with applicable discovery rules; and (3) if First Bank had made a timely evidentiary objection to all evidence of DTSG's damages offered at trial, the trial court could have determined that no question regarding DTSG's damages should be submitted to the jury or that any answer to such a question should be disregarded.[4]

---

*Motor Sales, U.S.A.*, 407 S.W.3d 746, 760 (Tex. 2013); *Underwriters at Lloyds v. Edmond, Deaton & Stephens Ins. Agency, Inc.*, No. 14-07-00352-CV, 2008 WL 5441225, at *6, n.7 (Tex. App.—Houston [14th Dist.] Dec. 30, 2008, no pet.) (mem. op.).

[3] First Bank asserts that it presented these complaints in a motion for directed verdict, objections during the charge conference, and a motion for judgment notwithstanding the verdict. We presume First Bank preserved error as to such complaints at the charge conference and in the motion for judgment notwithstanding the verdict. First Bank moved for directed verdict after DTSG and Brumitt rested their cases-in-chief, but this motion did not preserve error because First Bank presented evidence after the trial court denied this motion and First Bank did not renew the motion for directed verdict at the close of all of the evidence. *See Liberty Mut. Ins. Co. v. Heitkamp Swift Architects, Inc.*, No. 14-12-00873-CV, 2014 WL 261010, at *1 (Tex. App.—Houston [14th Dist.] Jan. 23, 2014, pet. denied) (mem. op.); *Dalbosco v. Seibert*, No. 14-11-00429-CV, 2012 WL 1795108, at *4–5 (Tex. App.—Houston [14th Dist.] May 17, 2012, pet. denied) (mem. op.).

[4] First Bank relies upon the Third Court of Appeals's opinion in *Robinson v. Lubbering. See* No. 03-09-00605-CV, 2011 WL 749197, at *2–9 (Tex. App.—Austin Mar. 2011, no pet.) (mem. op.). In that case, the defendants objected throughout trial to all evidence of the plaintiff's damages on the grounds that the evidence should be excluded based on the plaintiff's failure to comply with discovery rules. *See id.* Rather than expressly overrule or sustain these objections, the trial court "opted to carry [defendants'] objections and motions to exclude through trial and ultimately to submit, over objection, [plaintiff's] damages claims to the jury." *Id.* at *2. After the jury answered and found liability and damages as to one of the claims, the trial court disregarded the damage finding on the ground that the evidence of plaintiff's damages should have been excluded based on the objections the trial court had "opted to carry." *See id.* at *2–3. The court of appeals affirmed this ruling, thus indicating that a jury's answer to a damage question may be disregarded on the ground that all evidence of damages should have been excluded at trial, even though this evidence was not excluded. *See id.* at *9. We presume,

5

First Bank does not assert, and the record does not reflect, that (1) First Bank obtained a running objection to the admission of any evidence of DTSG's damages based on these complaints, or (2) First Bank timely objected to all trial evidence of DTSG's damages.[5] Under its first issue, First Bank does not assert that the trial evidence is legally insufficient to support the jury's damages findings regarding DTSG's claims. Even under the above presumptions, the trial court did not err in submitting damage questions to the jury over these complaints or in refusing to disregard the jury's damage findings based on these complaints if First Bank failed to timely object to all trial evidence of DTSG's damages. *See Grohlman v. Kahlig*, 318 S.W.3d 882, 888 (Tex. 2010) (noting that Texas Rules of Civil Procedure require the submission of jury questions raised by the pleadings and the trial evidence and that a court may refuse to submit a question if there is no trial evidence warranting the submission of a question); *Bay Area Healthcare Group, Ltd. v. McShane*, 239 S.W.3d 231, 235 (Tex. 2007) (noting that any error in the admission of evidence is waived if the complaining party allows the evidence to be introduced without objection). Accordingly, we overrule First Bank's first issue.

**B.    Did the trial court abuse its discretion in allowing Brumitt's lead trial lawyer to testify as an expert regarding DTSG's attorney's fees?**

Under its second issue, First Bank asserts the trial court abused its discretion by allowing Brumitt's lead trial counsel to testify as an expert as to DTSG's attorney's fees.

---

without deciding, that this case was correctly decided and would be followed by the Fourteenth Court of Appeals.

[5] First Bank's failure to object to all of the evidence of DTSG's damages is one of the factual distinctions between today's case and the *Lubbering* case. *See Lubbering*, 2011 WL 749197, at *2–9.

6

At trial, DTSG attempted to call its lead trial counsel as an expert witness to testify as to what a reasonable fee would be for the necessary services of DTSG's attorneys. First Bank objected that DTSG had not designated any expert witness as to attorney's fees in response to First Bank's request for disclosure. The trial court noted that DTSG had not designated an expert witness for attorney's fees. Brumitt had designated his lead trial counsel as an expert regarding Brumitt's attorney's fees, and First Bank objected to the sufficiency of Brumitt's disclosure regarding this expert's opinions. After the trial court indicated that it would overrule First Bank's objection to Brumitt's expert and allow him to testify as to Brumitt's attorney's fees, DTSG asked the trial court to allow DTSG to call Brumitt's lead counsel as an expert regarding DTSG's attorney's fees. DTSG noted that it had sent its attorney's fees invoices to First Bank. DTSG also relied upon a statement in its expert designations that DTSG claimed was sufficient to designate the experts of all other parties as experts for DTSG.

First Bank admitted receiving the invoices a couple of days before trial. Nonetheless, First Bank stated that (1) DTSG did not designate an attorney's fees expert or provide any information regarding any expert's opinions and (2) First Bank did not know what amount DTSG was claiming to be a reasonable fee for the necessary services of DTSG's attorneys. After the trial court first indicated that it would allow Brumitt's counsel to testify only as to a reasonable fee for the necessary services of Brumitt's attorneys, the trial court then stated it would allow Brumitt's counsel to testify as to what DTSG disclosed to First Bank.

Brumitt's counsel then testified regarding the contents of the attorney's fees invoices to DTSG. DTSG offered these invoices into evidence, but the trial court sustained First Bank's objection, and these invoices were never admitted. The trial

court gave First Bank a running objection to the entirety of the testimony of Brumitt's counsel and allowed Brumitt's counsel to testify to the reasonableness of the attorney's fees charged for the services DTSG's attorneys rendered.

Texas Rule of Civil Procedure 193.6, which governs the consequences for failing to timely respond to written discovery, provides in pertinent part as follows:

> (a) *Exclusion of Evidence and Exceptions.* A party who fails to make, amend, or supplement a discovery response in a timely manner may not introduce in evidence the material or information that was not timely disclosed, or offer the testimony of a witness (other than a named party) who was not timely identified, unless the court finds that:
>
> (1) there was good cause for the failure to timely make, amend, or supplement the discovery response; or
>
> (2) the failure to timely make, amend, or supplement the discovery response will not unfairly surprise or unfairly prejudice the other parties.
>
> (b) *Burden of Establishing Exception.* The burden of establishing good cause or the lack of unfair surprise or unfair prejudice is on the party seeking to introduce the evidence or call the witness. A finding of good cause or of the lack of unfair surprise or unfair prejudice must be supported by the record.

Tex. R. Civ. P. 193.6.

On appeal, DTSG suggests that it did not need to designate Brumitt's counsel as its expert because he was testifying based on his personal knowledge of the work he did with DTSG's attorneys. But, even if some of the testimony dealt with the work Brumitt's counsel did with DTSG, the core of the testimony at issue is Brumitt's expert testimony as to a reasonable fee for the necessary services of DTSG's attorneys, and this testimony is expert testimony for which an expert designation is required. *See E.F. Hutton & Co. v. Youngblood*, 741 S.W.2d 363, 364 (Tex. 1987) (per curiam).

8

DTSG also argues that it did designate Brumitt's counsel as its expert based on the following language in its expert-designation document:

> [DTSG] express[es] [its] intention to possibly call witnesses associated with adverse parties and any other party's experts.
>
> . . .
>
> [DTSG] hereby designate[s], as adverse parties, potentially adverse parties, and/or as witnesses associated with adverse parties, all parties to this suit and all experts designated by any party to this suit . . . .

We conclude that this language was insufficient to designate Brumitt's counsel as an expert regarding attorney's fees or to satisfy DTSG's obligations to update its responses to First Bank's requests for disclosure.[6] *See American Cyanamid Co. v. Frankson*, 732 S.W.2d 648, 655–56 (Tex. App.—Corpus Christi 1987, writ ref'd n.r.e.) (concluding that an expert designation in which a party reserved the right to call all experts designated to testify as witnesses by other parties was insufficient).

By overruling First Bank's objections and allowing Brumitt's counsel to testify on direct examination as DTSG's attorney's fees expert, the trial court implicitly found that either (1) there was good cause for DTSG's failure to timely make, amend, or supplement the discovery response; or (2) the failure to timely make, amend, or supplement the discovery response did not unfairly surprise or unfairly prejudice First Bank.[7] *See* Tex. R. Civ. P. 193.6. Though the burden of

---

[6] DTSG relies upon this court's opinion in *Missouri Pacific Railroad Company v. Lemon*. *See* 861 S.W.2d 501, 531 (Tex. App.—Houston [14th Dist.] 1993, writ dism'd by agr.). The part of that opinion on which DTSG relies involved discovery responses regarding persons with knowledge of relevant facst, rather than expert-witness designations, and in *Lemon* the objecting parties themselves had designated the fact witnesses to which they objected. *See id*. We conclude that *Lemon* is not on point. *See id*.

[7] On appeal, DTSG argues that the record supports the trial court's implied finding as to unfair surprise or unfair prejudice; DTSG does not argue that the record supports the trial court's implied finding as to good cause.

9

establishing good cause or the lack of unfair surprise or unfair prejudice was on DTSG, that party did not expressly argue prior to this expert's testimony that either of these exceptions applied, nor did DTSG submit evidence to the trial court in an attempt to establish either of these exceptions. An expert may testify that a reasonable fee for the necessary services of a party's attorneys is less than, equal to, or more than the amount of fees charged by those attorneys. DTSG's sending to First Bank copies of its invoices a few days before trial did not communicate to First Bank that DTSG intended to call any expert witness, or that any expert witness would opine that any amount was a reasonable fee for the necessary services of DTSG's attorneys.

DTSG listed Brumitt's counsel on its original witness list, but did not refer to him testifying as an expert. Two weeks before trial, DTSG listed Brumitt's counsel on its amended witness list and referred to him as "expert witness on attorneys' fees." But, DTSG did not state that counsel would be an expert witness on DTSG's attorney's fees, and these lists did not constitute discovery responses or provide the information about experts requested in First Bank's request for disclosure. DTSG correctly states that it has sought to recover attorney's fees throughout this case, but a party's seeking to recover attorney's fees does not necessarily mean that the party will submit expert testimony regarding these attorney's fees. DTSG asserts that First Bank apparently anticipated DTSG would call an expert witness regarding attorney's fees because, more than a year before trial, First Bank designated expert witnesses to testify regarding the reasonableness and necessity of any attorney's fees that any party in the case sought to recover. But, designating a potential expert to testify as to whether the fees sought by DTSG or Brumitt are reasonable and necessary does not mean that First Bank knew that DTSG would call an attorney's fees expert.

10

On this record, we conclude the trial court abused its discretion by impliedly concluding either (1) good cause existed for DTSG's failure to timely make, amend, or supplement the discovery response; or (2) the failure to timely make, amend, or supplement the discovery response did not unfairly surprise or unfairly prejudice First Bank.[8] *See* Tex. R. Civ. P. 193.6; *Green Tree Servicing v. Sanders*, No. 04-13-00156-CV, 2014 WL 2443811, at *6 (Tex. App.—San Antonio May 28, 2014, no pet.) (mem. op.). Thus, the trial court abused its discretion by allowing Brumitt's lead trial counsel to testify as an expert as to DTSG's attorney's fees. We conclude that the trial court's error probably caused the rendition of an improper judgment. *See* Tex. R. App. P. 44.1(a); *E.F. Hutton & Co.*, 741 S.W.2d at 364; *Nelson v. Schanzer*, 788 S.W.2d 81, 88 (Tex. App.—Houston [14th Dist.] 1990, writ denied). In this context, under binding precedent from the Supreme Court of Texas, the proper appellate remedy is to modify the trial court's judgment to delete the award of attorney's fees in favor of DTSG. *See E.F. Hutton & Co.*, 741 S.W.2d at 364; *Nelson*, 788 S.W.2d at 88. Accordingly, we sustain this part of First Bank's second issue and modify the trial court's judgment to delete this award.[9]

---

[8] DTSG claims that First Bank conceded that it knew what the testimony of DTSG's attorney's fees expert would concern. During a colloquy with the trial court, First Bank's counsel stated that he could not rebut experts when he did not know what they were going to say. The trial court responded by saying, "You know what they are going to say." First Bank's counsel said, "Well Your Honor, I do know what they're going to say. I don't know what the number is, and it is hard for me to determine how I am going to respond to an amount when I am going to be hearing it for the first time today." Given this, we conclude that First Bank did not admit or concede that it knew what the testimony of Brumitt's counsel would be regarding DTSG's attorney's fees.

[9] We need not and do not address First Bank's other arguments under its second issue. To the extent First Bank argues that the trial court erred in submitting the issue of attorney's fees to the jury or that the evidence is legally insufficient to support the jury's findings regarding DTSG's attorney's fees, we do not address these arguments.

## C.    Was the testimony of DTSG's expert unreliable?

In its sixth issue, First Bank asserts that the testimony of DTSG's expert, Anthony DeBenedictis, was unreliable and thus legally insufficient to support the jury's verdict.  Because of DTSG's failure to timely disclose all of the matters on which DeBenedictis planned to testify at trial, the trial court indicated that, though DeBenedictis could testify as to his opinion regarding the value of DTSG on December 31, 2007, DeBenedictis could not testify as to his opinion regarding the value of DTSG on any other date or regarding the amount of damages DTSG allegedly sustained.  At trial, DeBenedictis testified regarding his opinion that the value of DTSG on December 31, 2007 was $493,873.  First Bank argues that this testimony was not based upon specialized knowledge, did not have a sufficient basis, and was not reliable.[10]  In support of its argument, First Bank asserts the following:

- DeBenedictis became a Certified Public Accountant in 2010, and his testimony at trial was only the second time that he had testified in court.

- DeBenedictis was unfamiliar with the opinions of recognized experts in his field with regard to the "order of magnitude" that should be used when comparing companies to determine value.

- During direct examination, DeBenedictis changed a percentage used in his calculation from 7.2% to 6.0% as he was presenting his calculation to the jury.

- DeBenedictis admitted that his workpapers and calculations contained typographical errors for which he was responsible.

- Although the Statement of Standards of Valuation Services Number 1

---

[10] First Bank raised these issues in a pre-trial motion to exclude DeBenedictis's testimony. The trial court denied the motion.

recommends using the income approach, the asset approach, and the market approach in valuing a business, DeBenedictis used only the income and market approaches.

- Though DTSG is not a publicly traded company, DeBenedictis used publicly traded companies in his valuation analysis.

- When confronted with the fact that DTSG, Ltd. did not exist on December 31, 2007, DeBenedictis testified that he performed the valuation presuming that DTSG, Ltd. was a successor company to DTS Group, LLP.

- First Bank's expert, Richard Claywell, testified that DeBenedictis's opinion was not supported by sufficient relevant data and was unreliable because DeBenedictis did not follow the professional standards that certified public accountants are required to follow in performing business valuations.

- The "analytical gap" between the data upon which DeBenedictis relied and his opinion as to the value of DTSG on December 31, 2007, was too great.

- DeBenedictis's opinion as to value was not reliable because it was based on a flawed methodology and mathematical errors.

For an expert's testimony to be admissible, the expert must be qualified to testify about "scientific, technical, or other specialized knowledge," and the testimony must be relevant and based upon a reliable foundation. *See* Tex. R. Evid. 702; *TXI Transportation Co. v. Hughes*, 306 S.W.3d 230, 234 (Tex. 2010). An expert's testimony is relevant when it assists the jury in determining an issue or in understanding other evidence. *See* Tex. R. Evid. 702; *TXI Transportation Co.*, 306 S.W.3d at 234. But, expert testimony based on an unreliable foundation or flawed methodology is unreliable and does not satisfy the requirements of Texas Rule of Evidence 702. *See* Tex. R. Evid. 702; *TXI Transportation Co.*, 306 S.W.3d at 234.

When the reliability of an expert's testimony is challenged, courts should ensure that the expert's opinion comports with the applicable professional

13

standards. *See TXI Transportation Co.*, 306 S.W.3d at 235. To aid courts in making that determination, the Supreme Court of Texas has suggested several factors to consider when assessing the admissibility of expert testimony under Rule 702. *See id*. These factors include the following: (1) the extent to which the theory has been or can be tested; (2) the extent to which the technique is dependent upon the subjective interpretation of the expert; (3) whether the theory has been subjected to peer review or publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the non-judicial uses of the theory or technique. *See id*. at 235, n.2. The high court has emphasized, however, that these factors are non-exclusive, and that they do not fit every scenario. *See id*. at 235.

Expert testimony is unreliable when there is simply too great an analytical gap between the data upon which the expert relies and the opinion the expert offers. *See id*. at 239. Expert testimony is also unreliable if it is not grounded in scientific methods and procedures, but rather is based upon subjective belief or unsupported speculation. *See id*. The court's ultimate task, however, is not to determine whether the expert's conclusions are correct, but rather to determine whether the analysis the expert used to reach those conclusions is reliable and therefore admissible. *See id*.

DTSG sought to recover damages based upon the decline in value of DTSG that allegedly resulted from First Bank's breach of contract. In question two of the jury charge, the trial court asked the jury to determine the amount of money, if any, that would fairly and reasonably compensate DTSG for its past consequential damages that resulted from First Bank's failure to comply with one or more of the

commitment letters. The trial court instructed the jury that consequential damages refers to "[l]oss of business value that was a natural, probable, and foreseeable consequence of [First Bank's] failure to comply." At the charge conference, no party objected to the instructions in question two or to the form of this question. In this context, DeBenedictis's testimony regarding his opinion of DTSG's value on December 31, 2007, was relevant.

DeBenedictis testified as follows:

- DeBenedictis has worked at a valuation and litigation consulting firm for six and a half years. He specializes in economic damages, valuation, and forensic accounting. He is a certified public accountant in Texas and is accredited in business valuation.

- Over the past six years DeBenedictis has been involved in over two hundred business valuations, although he has been the person in charge of the valuation only four to six times.

- DeBenedictis valued DTSG, Ltd rather than DTS Group, LLC or Sheriff & Company because DTSG is the party to this suit, and it is the successor company to DTS Group, LLC and Sheriff & Company.

- DTSG, Ltd. took on the liabilities and obligations of the two predecessor companies—DTS Group, LLC and Sheriff & Company—and the accounting books did not change.

- The information DeBenedictis had available was adequate to perform a business valuation, and he relied upon information that is the same type of information that those in the field of business valuation rely upon to determine the value of a business.

- There are three approaches to valuing a business: the income approach, the market approach, and the asset approach. DeBenedictis used the discounted cash flow methodology under the income approach and the public-company and mergers-and-acquisitions methodology under the market approach. These methodologies are widely publicized and peer-reviewed and are the same whether the company is being valued for litigation purposes or for

15

non-litigation purposes.

- The asset approach is based on converting the assets of a business to cash. DeBenedictis considered using this approach but decided it would be inappropriate to use this approach because DTSG is a service provider.

DeBenedictis explained how he calculated DTSG's value on December 31, 2007, based upon the income approach using a discounted-cash-flow method. DeBenedictis also testified regarding his calculation of DTSG's value on December 31, 2007, based upon the market approach using a public-company model and a mergers-and-acquisitions model. DeBenedictis explained how he weighted the three values to come up with a final valuation of $493,873.

After reviewing the record under the applicable standard of review, we conclude that DeBenedictis's testimony regarding his opinion of DTSG's value on December 31, 2007, was based upon specialized knowledge and was reliable. *See Von Hohn v. Von Hohn*, 260 S.W.3d 631, 634–38 (Tex. App.—Tyler 2008, no pet.) (rejecting argument that valuation expert's testimony was irrelevant and unreliable); *In re Marriage of Rice*, 96 S.W.3d 642, 647–48 (Tex. App.—Texarkana 2003, no pet.) (rejecting argument that valuation expert's testimony was unreliable). We overrule First Bank's sixth issue.

**D.** **Is there merit in any of First Bank's challenges under its eighth issue to the jury's breach-of-contract findings in favor of DTSG?**

There was evidence at trial that at all material times Don Oprea has been the owner of DTSG and that he was the owner of DTS Group, LLP, the predecessor to DTSG. There was also evidence that First Bank sent an undated commitment letter to Oprea of "DTS Group" in February 2008 (the "First Letter"). Oprea signed the First Letter and then returned it to First Bank within the time period specified in the First Letter.

16

There was evidence that First Bank sent a second, undated commitment letter to Oprea of "DTS Group" in April 2008 (the "Second Letter"). The text of the Second Letter is substantially similar to the text of the First Letter, except that the amount of the loan and of the life-insurance policy was reduced from $1,250,000 to $800,000. Oprea signed the Second Letter and returned the signed letter to First Bank within the time period specified in the Second Letter.

There was evidence that First Bank sent a third, undated commitment letter to Oprea of "DTSG, Ltd." in August 2008 (the "Third Letter"). The text of the Third Letter is substantially similar to the text of the Second Letter, except that (1) the amount of the loan and of the life-insurance policy was increased to $923,000; (2) the borrower was described as "DTSG, Ltd."; and (3) the guarantors were different. Oprea signed the Third Letter and returned the signed letter to First Bank within the time period specified in the Third Letter.

In the jury charge, the trial court defined "Agreements" to mean "the loan commitment issued by First Bank in February 2008, the loan commitment issued by First Bank in April 2008, and the loan commitment issued by First Bank in August 2008," thus defining "Agreements" to mean the First Letter, the Second Letter, and the Third Letter (collectively the "Letters"). In response to the question one, the jury found that First Bank failed to comply with "any Agreement with DTSG," thus finding that First Bank failed to comply with one or more of the Letters.

### 1. DTSG's alleged failure to satisfy each condition precedent

Under its eighth issue, First Bank argues that the evidence is legally insufficient to support the jury's finding that First Bank failed to comply with one or more of the Letters because DTSG did not satisfy its burden of proving that each

17

of the conditions precedent listed in the Letters was satisfied.

In its live petition, DTSG pleaded that all conditions precedent to its claims for relief had been performed or had occurred. Therefore, DTSG was required to prove only the conditions precedent that First Bank specifically denied. *See* Tex. R. Civ. 54; *Community Bank & Trust v. Fleck*, 107 S.W.3d 541, 542 (Tex. 2002) (per curiam). First Bank's live answer to DTSG's petition does not contain any specific denials as to the alleged conditions precedent asserted by First Bank.[11] Because First Bank did not specifically deny that any condition precedent had been performed or had occurred, DTSG did not have to prove at trial that any condition precedent was satisfied.[12] *See* Tex. R. Civ. 54; *Community Bank & Trust*, 107 S.W.3d at 542; *Bencon Management & General Contracting, Inc. v. Boyer, Inc.*, 178 S.W.3d 198, 203–05 (Tex. App.—Houston [14th Dist.] 2005, no pet.).

The only argument First Bank briefs in support of its contention that the evidence is legally insufficient to support the jury's finding that First Bank breached one of the Letters is its argument that the evidence is legally insufficient to support a finding that DTSG satisfied each of the applicable conditions precedent. Because DTSG did not have to prove at trial that any condition precedent was satisfied, this argument lacks merit. *See* Tex. R. Civ. 54; *Community Bank & Trust*, 107 S.W.3d at 542; *Bencon Management & General Contracting, Inc.*, 178 S.W.3d at 203–05. Accordingly, we overrule First Bank's eighth issue to the extent First Bank argues that the evidence is legally insufficient to support the

---

[11] The answer contains a general denial and does not mention anything about conditions precedent. On appeal, First Bank does not assert that it specifically denied that any condition precedent had been performed or had occurred.

[12] First Bank cites several cases involving conditions precedent, but none of these cases involve application of Texas Rule of Civil Procedure 54.

jury's finding that First Bank failed to comply with one or more of the Letters.

### 2. *Existence of evidence showing that any damages to DTSG resulted from First Bank's failure to comply with one of the Letters*

In the second section under its eighth issue, First Bank asserts that there is no evidence that its alleged breach of contract caused any injury to DTSG. Specifically, First Bank contends that there is no evidence showing that its failure to fund the loan caused damages to DTSG. In this part of its briefing First Bank makes several statements about some of the evidence in the record.[13] First Bank cites testimony from Oprea that DTSG entered into a three-year lease for a larger space in anticipation of the acquisition of Southway, that DTSG hired an acquisition consultant, and that DTSG moved a key salesperson to Southway. First Bank notes that this activity all occurred in January or early February 2008, before any of the Letters were issued.[14]

First Bank does not mention in its briefing that, in response to question two, the jury found that $300,000 would fairly and reasonably compensate DTSG for its past direct damages that resulted from First Bank's failure to comply with one or more of the Letters and that $493,873 would fairly and reasonably compensate

---

[13] First Bank cites Oprea's testimony regarding (1) the current status of DTSG's business, (2) the status of DTSG's business in 2007, (3) losses that DTSG suffered in 2008, 2009, 2010, and 2011. First Bank cites evidence indicating that (1) the Stock Purchase Agreement was never rescinded, canceled, or breached; (2) after taking his loan file from First Bank, Oprea continued to seek financing from other banks in 2009 to consummate the Stock Purchase Agreement; (3) the Stock Purchase Agreement did not require First Bank to provide any financing; and (4) DTSG's obligation to close under the Stock Purchase Agreement was contingent upon DTSG obtaining financing.

[14] First Bank also states that DTSG did not deliver a copy of the final Stock Purchase Agreement to First Bank until June 2008, and that this delivery was one of the conditions of the loan commitment. As discussed in the previous section, DTSG did not have to prove at trial that any condition precedent was satisfied.

DTSG for its past consequential damages that resulted from this failure to comply. First Bank does not mention the trial court's instructions to the jury regarding the legal standard for the jury's determination of direct damages and consequential damages. At the charge conference, no party objected to either of these instructions or to the form of question two. Therefore, the sufficiency of the evidence supporting the jury's damage findings is to be measured using the charge given. *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000). First Bank does not assert that the evidence is legally insufficient to support the jury's finding in response to question two.[15] First Bank does not state that the evidence is legally insufficient to support the jury's finding that $300,000 in direct damages or $493,873 in consequential damages resulted from First Bank's failure to comply with one or more of the Letters. The reporter's record contains more than 830 pages of testimony from witnesses at trial and more than 6,900 pages of trial exhibits. This court has no duty to search a voluminous record without guidance from First Bank to determine its argument. *See Marsh v. Livingston*, No. 14-09-00011-CV, 2010 WL 1609215, at *5 (Tex. App.—Houston [14th Dist.] Apr. 22, 2010, pet. denied) (mem. op.). Even under a liberal construction of this part of First Bank's appellate briefing, we conclude that First Bank is only arguing that there is no evidence that any damage to DTSG resulted from First Bank's alleged breach of contract by failing to fund the loan to DTSG.

Oprea testified that in reliance on First Bank's promises to fund a loan to DTSG that predated the Letters, DTSG hired an acquisition consultant in January

---

[15] At one point in this section of its brief, First Bank states that the evidence is legally insufficient to support the "jury's answer to the breach of contract question for DTSG." But, that question (question one) did not involve causation or the issue of whether any damage resulted from First Bank's failure to comply.

2008, and agreed to pay him $72,000 per year. Oprea also testified that in late January or early February 2008 (approximately one month before the First Letter was issued), DTSG moved a key salesperson over to Southway to begin the transition that would occur when DTSG purchased the stock of Southway. According to Oprea, moving that senior salesperson to Southway decreased DTSG's sales revenues, and DTSG also paid this employee a salary of $45,000 per year to work at Southway while not creating any revenue for the company. Though DTSG took these actions approximately one month before First Bank issued the First Letter, under the applicable standard of review, the trial evidence would enable reasonable and fair-minded people to find that, after First Bank issued the First Letter, DTSG continued to pay the acquisition consultant and continued to pay the salesperson to work at Southway in reliance upon the First Letter and that damage to DTSG resulted from First Bank's breach of contract by failing to fund the loan to DTSG. Therefore, First Bank's argument in the second section under its eighth issue lacks merit.

### 3. *First Bank's challenges in support of its assertion that there was no evidence of DTSG's damages*

In the third section under its eighth issue, First Bank asserts that there is no evidence of DTSG's damages. In support of this assertion, First Bank states that DTSG's only evidence of damages is DeBenedictis's testimony. But, the voluminous record from trial contains other evidence regarding damages, some of which is discussed in DTSG's appellate briefing. First Bank does not address this evidence; rather, it presumes that DeBenedictis's testimony as to DTSG's value on December 31, 2007, is the only arguable evidence supporting the existence of any

21

damages to DTSG resulting from First Bank's breach of contract.[16]

First Bank states in a conclusory manner that there is no evidence of any lost profits, lost business opportunities, or any actual or consequential damages of any kind caused by First Bank as a result of the failure to close and fund the loan commitments. Though First Bank provides a few record cites and cites one case, it does not evaluate or dissect the voluminous evidence admitted during trial or present argument and analysis to show that under the applicable standard of review, none of this evidence would enable reasonable and fair-minded people to find that any damage to DTSG resulted from any failure of First Bank to comply with any of the Letters. First Bank briefly outlines what would have happened if the closing had occurred under the Stock Purchase Agreement, but this argument is only relevant to benefit-of-the-bargain or expectancy damages. First Bank correctly notes that its failure to fund any loan to DTSG did not cause DTSG to be in breach of the Stock Purchase Agreement, which was conditioned on DTSG obtaining financing. Though this conclusion means that DTSG did not suffer any damages by being in breach of the Stock Purchase Agreement, it does not mean that DTSG suffered no damages at all. In this short section, First Bank has not sufficiently briefed an argument showing that, under the applicable standard of review, the voluminous trial evidence would not enable reasonable and fair-minded people to find that any damage to DTSG resulted from any failure of First Bank to comply with any of the Letters. *See Marsh,* 2010 WL 1609215, at *5.

In light of our sustaining, in part, of the second issue, we need not address

---

[16] First Bank also refers back to its arguments under the sixth issue. We already have addressed and overruled this issue.

the fourth and last section under the eighth issue regarding the sufficiency of the evidence as to DTSG's attorney's fees. Except to this extent, we overrule First Bank's eighth issue.

**E.    Did the trial court err in submitting a question to the jury as to whether Brumitt was a third-party beneficiary of one or more of the Letters?**

Under its third issue, First Bank argues that the trial court erred in submitting question four to the jury as to whether Brumitt was a third-party beneficiary of one or more of the Letters. First Bank asserts that, as to a written contract, the third-party-beneficiary analysis is limited to the four corners of the contract in question. According to First Bank, each of the Letters is unambiguous, and the unambiguous language of each of the Letters does not demonstrate the intent necessary for Brumitt to be a third-party beneficiary. First Bank argues that because the construction of an unambiguous contract is a matter of law for the court, the trial court should not have submitted the third-party-beneficiary issue to the jury, but should have rendered judgment as a matter of law that Brumitt is not a third-party beneficiary of any of the Letters.[17] Brumitt asserts that extrinsic evidence may be considered in determining whether a person was a third-party beneficiary of the contract.

Before addressing the extrinsic-evidence issue, we first note basic principles of Texas law as to whether a nonparty may enforce a contract. "The fact that a person might receive an incidental benefit from a contract to which he is not a party does not give that person a right of action to enforce the contract." *Basic Capital Management v. Dynex Commercial*, 348 S.W.3d 894, 899–900 (Tex. 2011)

_____

[17] First Bank preserved error in the trial court as to this argument by objecting to question four during the charge conference.

23

(quoting *MCI Telecommunications Corporation v. Texas Utilities Electric Corporation*, 995 S.W.2d 647,651 (Tex. 1999)). The fact that one is directly affected by the contracting parties' conduct, or that one may have a substantial interest in the contract's enforcement, does not make one a third-party beneficiary. *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 421 (Tex. 2011). A third party may recover on a contract made between other parties only if the contracting parties intended to secure some benefit to the third party, and only if the contracting parties entered into the contract directly for the third party's benefit. *Basic Capital Management*, 348 S.W.3d at 900. In determining whether a third party can enforce a contract, the intention of the contracting parties is controlling. *Id*. A court will not create a third-party-beneficiary contract by implication. *Id*. Consequently, courts presume that parties contracted for themselves unless it "clearly appears" that they intended a third party to directly benefit from the contract. *Id*. The intention of the contracting parties to confer a direct benefit on a third party must be "clearly and fully spelled out" or enforcement by the third party must be denied. *Id*.

We must decide whether, in determining if a person is a third-party beneficiary of a written contract, this intention of the contracting parties to confer a direct benefit on the third party must be "clearly and fully spelled out" in the written contract alone, as argued by First Bank, or whether this intention may be "clearly and fully spelled out" in the contract or in extrinsic evidence regarding the contracting parties' intent. First Bank relies upon *MCI Telecommunications Corporation v. Texas Utilities Electric Corporation* and its progeny. *See* 995 S.W.2d 647 (Tex. 1999). In *MCI*, the contract contained an express provision in which the parties unambiguously agreed that the contract should not be interpreted

as conferring any benefits on nonsignatory parties.[18]  *See id*. at 652.  Though the *MCI* court could have crafted a legal standard limited to the determination of third-party-beneficiary status in the context of a contract containing such a clause, the *MCI* court did not do so.  *See id*. at 651–52.  Instead, after articulating the general rules for third-party-beneficiary status, the *MCI* court indicated that the intention of contracting parties to confer a direct benefit on a third party must be "clearly and fully spelled out" in the contract itself.  *See id*. at 651–52 (stating that "[t]here is simply no contractual language to indicate that MCI and MoPac entered into the contract directly for TU's benefit.  *Thus*, TU is not a creditor or donee beneficiary of the contract and, at best, is an incidental beneficiary of the contract" and that "[t]he contract between MCI and MoPac does not contain any such indication. *Therefore*, TU is not a third party-beneficiary") (citations omitted, emphasis added).

The Supreme Court of Texas and a number of intermediate courts of appeals have construed the *MCI* opinion as limiting the scope of the third-party-beneficiary analysis to the four corners of a written contract.  *See Stine v. Stewart*, 80 S.W.3d 586, 589 (Tex. 2002) (citing the *MCI* case for the proposition that the agreement in question "must clearly and fully express an intent to confer a direct benefit to the third party") (per curiam); *Ortega v. City Nat'l Bank*, 97 S.W.3d 765, 773 (Tex. App.—Corpus Christi 2003, no pet.) (citing the *MCI* case for the proposition that "[t]he intent of the contracting parties to confer a direct benefit to the third party must be 'clearly and fully' expressed in the agreement itself").

We now consider whether two opinions issued by the Supreme Court of Texas in 2011 changed this rule.  *See Sharyland Water Supply Corp.*, 354 S.W.3d

---

[18] None of the Letters contain any such provision.

at 420–21; *Basic Capital Management*, 348 S.W.3d at 899–901. In *Basic Capital*, the high court quoted various principles of third-party-beneficiary law from the *MCI* opinion. *See Basic Capital Management*, 348 S.W.3d at 899–900. The *Basic Capital* court then noted that the construction of an unambiguous instrument is a question of law for the court. *See id*. at 900. The court did not state that the determination of the third-party-beneficiary issue is a question of law for the court. *See id*. at 899–901. The court then analyzed the contract in question and concluded that, if the parties did not intend to benefit the third parties directly, then the contract had no purpose whatsoever. *See id*. at 900. The court noted that the contract did not contain an express statement of an intention to benefit the third parties. *See id*. Nonetheless, the court concluded that the contract "'clearly and fully spelled out' *the benefit* to [the third parties] because their role was basic to [the contract]."[19] *Id*. at 901 (emphasis added). The *Basic Capital* court held that there was no need to obtain a jury finding as to the third-party-beneficiary issue because the contract was unambiguous and because "[t]he [contract] itself, and the undisputed evidence regarding its negotiation and purpose, establish that [the third parties] were third-party beneficiaries."[20] *Id*. at 901 (footnote omitted). In determining that two plaintiffs were third-party beneficiaries entitled to recover under an unambiguous loan-commitment contract, the *Basic Capital* court did not limit its review to the four corners of the unambiguous contract; rather, the court

---

[19] The *Basic Capital* court did not state that the contract "clearly and fully spelled out" the contracting parties' intention to confer a direct benefit on the third parties. *Basic Capital Management*, 348 S.W.3d at 900–01.

[20] Though the extrinsic evidence in *Basic Capital* was undisputed, the *Basic Capital* court nonetheless considered it. *See Basic Capital Management*, 348 S.W.3d at 901. Thus, the reason given by the *Basic Capital* court for why no jury finding was needed in light of the extrinsic evidence was not that extrinsic evidence may not be considered, but that the extrinsic evidence in that case was undisputed. *See id*.

considered evidence regarding the negotiation and purpose of the contract.[21]  *See id*.  We conclude that, after the *Basic Capital* decision, extrinsic evidence may be considered in determining whether a person is a third-party beneficiary of the contract, even if the contract is a written, unambiguous contract.  *See id*. at 899–901.

Six months after it decided *Basic Capital*, the Supreme Court of Texas issued its opinion in *Sharyland*.  *See Sharyland Water Supply Corp.*, 354 S.W.3d at 420–21.  Though the high court agreed with the court of appeals's conclusion that Sharyland was not a third-party beneficiary of the agreements as a matter of law, the high court did not employ the same analysis.  *Compare Sharyland Water Supply Corp.*, 354 S.W.3d at 420–21, *with City of Alton v. Sharyland Water Supply Corp.*, 277 S.W.3d 132, 148–52 (Tex. App.—Corpus Christi 2009), *aff'd in part, rev'd in part by Sharyland Water Supply Corp.*, 354 S.W.3d at 412–24.  The court of appeals applied the legal standard from the *MCI* line of cases, under which a person is not a third-party beneficiary of a contract unless the contract itself shows the contracting parties' intention to confer a direct benefit on the person.  *See City of Alton*, 277 S.W.3d 132, 149–50.  The high court in *Sharyland* indicated that extrinsic evidence should be considered in determining whether a person is a third-

---

[21] The *Basic Capital* court cited *Banker v. Breaux*, 128 S.W.2d 23, 24 (Tex. 1939) and described this case in a parenthetical as "stating that the contracting parties' intention, which is of controlling importance, must be ascertained from their agreement 'in the light of the attending circumstances.'" *Basic Capital Management*, 348 S.W.3d at 901, n. 24.  Nonetheless, the *Basic Capital* court did not describe the extrinsic evidence it considered as evidence of "attending circumstances"; rather the court described the extrinsic evidence as "evidence regarding [the contract's] negotiation and purpose." *Id*. at 901.

party beneficiary of the contract:

> Sharyland does not meet the criteria necessary to confer third party beneficiary status. Sharyland is neither mentioned in the contracts themselves, *nor is there evidence* that [the contracting parties] intended to confer a direct benefit on Sharyland.

*Sharyland Water Supply Corp.*, 354 S.W.3d at 421 (emphasis added). Though the high court also noted that the contracts did not clearly and fully spell out any intention by the contracting parties' to confer a direct benefit on Sharyland, the high court did not say that this was necessary for third-party-beneficiary status or that the inquiry was limited to the four corners of the contract. *See Sharyland Water Supply Corp.*, 354 S.W.3d at 420–21. The *Sharyland* court distinguished the facts of the *Basic Capital* case from the facts in *Sharyland*; nonetheless, the *Sharyland* court did not express any disagreement with *Basic Capital's* legal standard. *See id*. We conclude that the *Sharyland* court did not abrogate or modify the rule in *Basic Capital* that extrinsic evidence may be considered in determining whether one is a third-party beneficiary of the contract, even if the contract is a written, unambiguous contract.[22] *See id*. The parties have not cited and research has not revealed any case from the Supreme Court of Texas decided after *Basic Capital* in which the high court disagrees with *Basic Capital* regarding the consideration of extrinsic evidence. We conclude that under current law extrinsic evidence may be considered in determining whether a person is a third-party

---

[22] Though the opening paragraph of the third-party-beneficiary analysis in *Sharyland* contains a sentence emphasizing the contents of the contracts, the court does not say that extrinsic evidence should not be considered, and as quoted above, the court later indicates that extrinsic evidence should be considered. *See Sharyland Water Supply Corp.*, 354 S.W.3d at 420 (stating "[b]ecause the contracts entered into between [the contracting parties] make no reference to Sharyland and indicate no intention to confer a benefit on it, we agree with the court of appeals that Sharyland was not a third party beneficiary of those contracts").

beneficiary of the contract, even if the contract is a written, unambiguous contract. *See Basic Capital Management*, 348 S.W.3d at 899–901. Therefore, the trial court did not err in overruling First Bank's objection that no third-party-beneficiary issue should be submitted to the jury because the third-party-beneficiary analysis is limited to the four corners of each of the Letters and because construction of the unambiguous Letters is a matter of law for the court.

**F.     Is the evidence legally sufficient to support the jury's finding that Brumitt is a third-party beneficiary?**

Under its third issue, First Bank focuses on the extrinsic-evidence argument addressed in the previous section. We presume, under a liberal construction of its briefing, that First Bank also is arguing the trial evidence is legally insufficient to support the jury's finding in response to question four that Brumitt is a third-party beneficiary of one of the Letters. First Bank preserved error in the trial court on this issue only by means of its motion for judgment notwithstanding the verdict.[23] At the charge conference, no party objected to the legal standard submitted in question four for the jury's use in finding whether Brumitt was a third-party beneficiary of one or more of the Letters.[24]   Therefore, this court measures the

---

[23] First Bank moved for a directed verdict after DTSG and Brumitt rested their cases-in-chief, but the motion did not preserve error because First Bank presented evidence after the trial court denied the motion and First Bank did not renew the motion for directed verdict at the close of all of the evidence. *See Liberty Mut. Ins. Co.*, 2014 WL 261010, at *1; *Dalbosco*, 2012 WL 1795108, at *4–5. Though First Bank presented objections to question four at the charge conference, First Bank did not object that the evidence was legally insufficient under either the legal standard submitted in question four or under the legal standard provided under Texas law.

[24] During the charge conference, First Bank arguably objected to the part of the trial court's instruction that allowed the jury to consider extrinsic evidence in making this determination. Nonetheless, this instruction was correct, as explained in the previous section of this opinion, and this instruction addresses what the jury may consider in making its finding rather than the substantive legal standard under which the jury was to make the finding.

29

sufficiency of the evidence to support the jury's finding using the charge given. *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) (holding that appellate court could not review the sufficiency of the evidence based on a particular legal standard because that standard was not submitted to the jury and no party objected to the charge on this ground or requested that the jury be charged using this standard); *Hirschfeld Steel Co. v. Kellogg Brown & Root, Inc.*, 201 S.W.3d 272, 283–86 (Tex. App.—Houston [14th Dist.] 2006, no. pet.) (reviewing sufficiency of evidence based on unobjected-to jury instruction and rejecting various arguments based on different legal standards).

In response to question four's query "[d]id [First Bank] fail to comply with any Agreement with Brumitt, as Third Party Beneficiary?" the jury answered affirmatively.[25] For this question, the trial court instructed the jury as follows:

> A "Third Party Beneficiary" is an intended, and not just an incidental, beneficiary of a contract. If the intent to benefit a third party is not expressed in the contract, then intent may be shown using other evidence. The nature of the agreement, the identity of the alleged intended beneficiaries, and the specific duty said to have been created toward them are all factors for consideration. The beneficiary may recover if he can show that he is one of a class of persons for whose benefit the contract was made.

Under this instruction, a person would be a third-party beneficiary of a contract if the person is an "intended beneficiary" of the contract.

---

[25] Question four combined the issue of whether Brumitt is a third-party beneficiary of one or more of the Letters with the issue of whether First Bank failed to comply with its obligations to Brumitt as a third-party beneficiary of one or more of the Letters. At the charge conference, no party objected to this aspect of question four. Even so, we note that, despite this aspect of question four, the jury's response to it still constitutes a sufficient jury finding that Brumitt is a third-party beneficiary of one or more of the Letters.

The term "intended beneficiary" is not defined in the jury charge, so we measure the sufficiency of the evidence against the commonly understood meaning of "intended beneficiary." *See Barnhart v. Morales*, —S.W.3d—,—, 2015 WL 1020869, at *7 (Tex. App.—Houston [14th Dist.] Mar 5. 2015, no pet.). Merriam-Webster's Collegiate Dictionary defines "beneficiary" as "one that benefits from something" and "intend" as "to have in mind as a purpose." *Merriam-Webster's Collegiate Dictionary* 114, 768 (11th ed. 2004). We conclude that the commonly understood meaning of "intended beneficiary of a contract" is a person whom the contracting parties intended to benefit from the parties' agreement. The trial court instructed the jury that, in determining whether there was an intent to benefit Brumitt, the jury could look beyond the language of the Letters to extrinsic evidence. The trial court mentioned factors the jury could consider but, in listing these factors, the trial court did not address the standard by which the jury should decide whether Brumitt was a third-party beneficiary of any of the Letters. The trial court then stated that the beneficiary may recover if he can show that he is one of a class of persons for whose benefit the contract was made. Based on the commonly understood meaning of the words contained in the trial court's instruction, we conclude that the charge allowed the jury to find Brumitt was a third-party beneficiary of one or more of the Letters based solely on a finding that First Bank and DTSG intended Brumitt to benefit from one or more of the Letters.

In its argument under the third issue, First Bank asserts that (1) to be a third-party beneficiary of a contract, the contracting parties must have entered into the contract directly for the third party's benefit; (2) a party's status as a third-party beneficiary should not be created by implication; (3) there is a presumption that a non-contracting party is not a third-party beneficiary; (4) the contracting parties' intent that another person be a third-party beneficiary of the contract must be

"clearly and fully spelled out"; (5) to be a third-party beneficiary of a contract, a person must either be a donee beneficiary or a creditor beneficiary; and (6) a person cannot be a third-party beneficiary through the person's status as a creditor beneficiary unless the contract shows an intent to confer a benefit on the person and the intent that the person has a right to enforce the contract. Regardless of whether any of these propositions are correct expressions of Texas law, none of them were submitted to the jury, and no party objected to the omission of any of these propositions from the jury charge. Therefore, we do not apply any of these propositions as part of the standard by which we measure the sufficiency of the jury's third-party-beneficiary finding. *See Osterberg*, 12 S.W.3d at 55; *Hirschfeld Steel Co.*, 201 S.W.3d at 283–86. Instead, we review the trial evidence to see if there is legally sufficient evidence that First Bank and DTSG intended Brumitt to benefit from one or more of the Letters.

At trial Brumitt testified as follows:

- The Letters were for Brumitt's benefit.
- Tim Duffy of First Bank appeared at Brumitt's office one day unannounced. Brumitt had never before met Duffy.
- After Duffy introduced himself, Brumitt invited Duffy into Brumitt's office.
- Duffy reassured Brumitt that Duffy "was going to get this thing done" and that Oprea and Brumitt would be happy.
- Duffy stated that the loan would close the following Saturday and that the funds would be available the following Monday or Tuesday.
- Duffy called Brumitt later that day and asked some questions about the Bank loan.

At trial Oprea testified as follows:

- Southway had a line of credit with Wells Fargo Bank.

- Brumitt signed as a guarantor of this line of credit.

- Neither Wells Fargo Bank, nor Oprea, nor Brumitt was concerned that this line of credit be paid off as part of the stock-purchase transaction.

- First Bank said it would not fund the loan unless this line of credit was paid off as part of the stock-purchase transaction.

- After First Bank made the pay-off of this line of credit a requirement, this pay-off was made a requirement of the parties' agreement.

   At trial Duffy testified as follows:

- Brumitt, as the "seller of Southway," was going to get some of the proceeds of the loan from First Bank.

- If the First Bank loan had funded, the Wells Fargo line of credit would have been paid off.

- Duffy agreed that Brumitt would benefit from the Wells Fargo line of credit being paid off.

After reviewing the trial evidence under the applicable standard review, we conclude the evidence is legally sufficient to support a finding that First Bank and DTSG intended Brumitt to benefit from one or more of the Letters and to support the jury's finding in response to question four. *See Khan v. Safeco Surplus Lines*, No. 14-13-00024-CV, 2014 WL 3907976, at *5, n. 5 (Tex. App.—Houston [14th Dist.] Aug. 12, 2014, pet. denied) (concluding there was sufficient evidence that person was a third-party beneficiary of a contract). Accordingly, we overrule First Bank's third issue.

### G.  Does section 26.02 of the Business and Commerce Code apply to Brumitt's breach-of-contract claim?

In its ninth issue, First Bank asserts the evidence is legally insufficient to support the jury's verdict as to Brumitt's breach-of-contract claim. Under this issue, First Bank asserts that section 26.02 of the Business and Commerce Code applies to his breach-of-contract claim and that there is no evidence of a loan

agreement between Brumitt and First Bank that would satisfy the statute-of-frauds requirement contained in this statute. *See* Tex. Bus. & Com. Code Ann. § 26.02 (West, Westlaw through 2013 3d C.S.). Section 26.02 reads in its entirety as follows:

(a) In this *section*:

(1) "Financial institution" means a state or federally chartered bank, savings bank, savings and loan association, or credit union, a holding company, subsidiary, or affiliate of such an institution, or a lender approved by the United States Secretary of Housing and Urban Development for participation in a mortgage insurance program under the National Housing Act (12 U.S.C. Section 1701 et seq.).

(2) "Loan agreement" means one or more promises, promissory notes, agreements, undertakings, security agreements, deeds of trust or other documents, or commitments, or any combination of those actions or documents, pursuant to which a financial institution loans or delays repayment of or agrees to loan or delay repayment of money, goods, or another thing of value or to otherwise extend credit or make a financial accommodation. The term does not include a promise, promissory note, agreement, undertaking, document, or commitment relating to:

(A) a credit card or charge card; or

(B) an open-end account, as that term is defined by Section 301.002, Finance Code, intended or used primarily for personal, family, or household use.

(b) A loan agreement in which the amount involved in the loan agreement exceeds $50,000 in value is not enforceable unless the agreement is in writing and signed by the party to be bound or by that party's authorized representative.

(c) The rights and obligations of the parties to an agreement subject to *Subsection (b)* of this section shall be determined solely from the written loan agreement, and any prior oral agreements between the parties are superseded by and merged into the loan agreement.

(d) An agreement subject to *Subsection (b) of this section* may not be varied by any oral agreements or discussions that occur before or contemporaneously with the execution of the agreement.

(e) In a loan agreement subject to *Subsection (b) of this section*, the financial institution shall give notice to the debtor or obligor of the provisions of *Subsections (b) and (c) of this section*. The notice must be in a separate document signed by the debtor or obligor or incorporated into one or more of the documents constituting the loan agreement. The notice must be in type that is boldface, capitalized, underlined, or otherwise set out from surrounding written material so as to be conspicuous. The notice must state substantially the following:

"This written loan agreement represents the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous, or subsequent[2] oral agreements of the parties.

"There are no unwritten oral agreements between the parties.

………………………………                    ………………………………
    "Debtor or Obligor                                   Financial Institution"

(f) *If the notice required by Subsection (e) of this section is not given on or before execution of the loan agreement or is not conspicuous, this section does not apply to the loan agreement*, but the validity and enforceability of the loan agreement and the rights and obligations of the parties are not impaired or affected.

(g) All financial institutions shall conspicuously post notices that inform borrowers of the provisions of this section. The notices shall be located in such a manner and in places in the institutions so as to fully inform borrowers of the provisions of this section. The Finance Commission of Texas shall prescribe the language of the notice.

Tex. Bus. & Com. Code Ann. § 26.02 (emphasis added) (West, Westlaw through 2013 3d C.S.). First Bank asserts that section 26.02 applies to the Letters and that,

because none of the Letters satisfy the statute-of-frauds requirements of section 26.02, Brumitt may not enforce any of the Letters. *See id*. § 26.02(b), (c), (d). Brumitt argues that section 26.02 does not apply to any of the Letters because First Bank failed to give the notice required by subsection (e). *See id*. § 26.02(e), (f).

A holding from the Second Court of Appeals and an obiter dictum from this court support Brumitt's construction of the statute. *See Scott v. U.S. Bank Nat'l Ass'n*, No. 02-12-00230-CV, 2014 WL 3535724, at *10–11 (Tex. App.—Fort Worth Jul. 14, 2014, no pet.) (holding that "if the notice required by subsection (e) is not given on or before execution of the loan agreement or is not conspicuous, section 26.02 does not apply to the loan agreement) (mem. op.); *Comisky v. FH Partners, LLC*, 373 S.W.3d 620, 641, n. 25 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) (stating in an obiter dictum that for section 26.02 to apply, the financial institution must have given notice under subsection (e)). But, the Third Court of Appeals has held that, if the financial institution fails to comply with subsection (e), the statute-of-frauds requirement in subsection (b) still applies to the loan agreement, although subsections (c) and (d) do not apply. *See Maginn v. Norwest Mortgage, Inc*., 919 S.W.2d 164, 168 (Tex. App.—Austin 1996, no writ.). The parties have not cited and research has not revealed any precedent from the Supreme of Texas or any holding from this court addressing the effect of a failure to give the notice required by subsection (e).[26]

---

[26] Though this court previously has applied section 26.02 to loan agreements, in these cases, there was no issue as to the effect of a failure to comply with subsection (e). *See BACM 2001-1 San Felipe Road Ltd. P'ship*, 218 S.W.3d 137, 144–45 (Tex. App.—Houston [14th Dist.] 2007, pet. denied); *1001 McKinney Ltd. v. Credit Suisse First Boston Mortgage Capital*, 192 S.W.3d 20, 26–28 (Tex. App.—Houston [14th Dist.] 2005, pet. denied).

We review the trial court's interpretation of applicable statutes de novo. *See Johnson v. City of Fort Worth*, 774 S.W.2d 653, 655–56 (Tex. 1989). In construing a statute, our objective is to determine and give effect to the Legislature's intent. *See Nat'l Liab. & Fire Ins. Co. v. Allen*, 15 S.W.3d 525, 527 (Tex. 2000). If possible, we must ascertain that intent from the language the Legislature used in the statute and not look to extraneous matters for an intent the statute does not state. *Id.* If the meaning of the statutory language is unambiguous, we adopt the interpretation supported by the plain meaning of the provision's words. *St. Luke's Episcopal Hosp. v. Agbor*, 952 S.W.2d 503, 505 (Tex. 1997). We must not engage in forced or strained construction; instead, we must yield to the plain sense of the words the Legislature chose. *See id*.

We conclude that, under the unambiguous language of subsection (f), if the notice required by subsection (e) is not given on or before execution of the loan agreement or is not conspicuous, section 26.02, including subsection (b), does not apply to the loan agreement. *See* Tex. Bus. & Com. Code Ann. § 26.02(f); *Scott*, 2014 WL 3535724, at *10–11. Neither subsection (f) nor any other part of the statute states that a failure to comply with subsection (e) means that only subsections (c) and (d) do not apply to the loan agreement. No other part of section 26.02 conflicts with the plain language in subsection (f). *See* Tex. Bus. & Com. Code Ann. § 26.02. The Legislature could have provided that subsection (b) applies to a loan agreement, as defined in section 26.02, regardless of whether the financial institution gave notice under subsection (e). The Legislature chose not to do so. *See* Tex. Bus. & Com. Code Ann. § 26.02; *Scott*, 2014 WL 3535724, at *10–11; *Comisky*, 373 S.W.3d at 641, n. 25. *But see Maginn*, 919 S.W.2d at 168.

First Bank does not assert that it gave the notice required by subsection (e)

of section 26.02 as to any of the Letters. There was no jury finding that First Bank gave such notice, nor does the trial evidence prove this proposition as a matter of law.[27] Therefore, under the unambiguous language of the statute, section 26.02 does not apply to any of the Letters. *See* Tex. Bus. & Com. Code Ann. § 26.02; *Scott*, 2014 WL 3535724, at *10–11; *Comisky*, 373 S.W.3d at 641, n. 25. *But see Maginn*, 919 S.W.2d at 168.

Under its ninth issue, First Bank also asserts that there is no evidence (other than evidence related to Brumitt's claim as a third-party beneficiary of the Letters) of any contract between First Bank and Brumitt, and Brumitt was not a third-party beneficiary to any of the Letters as a matter of law. In Section II. F. above, we concluded that First Bank's legal-sufficiency challenge to the jury's third-party-beneficiary challenge lacked merit. This finding provided Brumitt with a basis to seek recovery against First Bank for its failure to comply with one or more of the Letters. *See Khan*, 2014 WL 3907976, at *5, n. 5.

Having addressed all of First Bank's complaints under its ninth issue, we overrule that issue.

**H.** **Did either DTSG or Brumitt suffer any injury independent from economic losses recoverable under a breach-of-contract claim?**

In its fourth issue, First Bank asserts that the trial court erred in submitting DTSG's and Brumitt's negligent-misrepresentation claims to the jury because these tort claims were "subsumed" by the claimants' breach-of-contract claims. Under this issue, First Bank argues that neither DTSG nor Brumitt can recover under a negligent-misrepresentation claim because neither party suffered any

---

[27] Indeed, there does not appear to be any trial evidence that First Bank gave such notice.

injury independent from economic losses recoverable under a breach-of-contract claim. First Bank further argues that, because neither party may recover based on a tort claim, neither party may recover exemplary damages.[28]

Under the independent-injury requirement for negligent-misrepresentation claims, to recover damages for negligent misrepresentation, a plaintiff must show that it suffered an injury independent from economic losses recoverable under a breach-of-contract claim. *See D.S.A., Inc. v. Hillsboro Indep. Sch. Dist.*, 973 S.W.2d 662, 663–64 (Tex. 1998); *Owen v. Option One Mortgage Corp.*, No. 01-10-00412-CV, 2011 WL 3211081, at *8 (Tex. App.—Houston [1st Dist.] Jul. 28, 2011, pet. denied); *Esty v. Beal Bank, S.S.B.*, 298 S.W.3d 280, 301–02 (Tex. App.—Dallas 2009, no pet.). Without this independent-injury requirement for negligent-misrepresentation claims, every contract-interpretation dispute would potentially be converted into a negligent-misrepresentation claim. *See D.S.A., Inc.*, 973 S.W.2d at 663–64.

In their respective contract claims, DTSG and Brumitt sought to recover economic damages that allegedly resulted from First Bank's failure to comply with its contractual obligation to provide a loan to DTSG to be used to fund DTSG's purchase of Brumitt's Southway stock. There is no distinction in the evidence between damages allegedly resulting from First Bank's failure to comply with one or more of the Letters and damages caused by First Bank's alleged negligent misrepresentation. In its closing argument, DTSG asserted that this case was about

---

[28] First Bank preserved error in the trial court as to this complaint by means of its motion for judgment notwithstanding the verdict and, in part, by means of objections at the charge conference.

"broken promises" and that despite at least nineteen promises by First Bank, including the three Letters, no loan was funded. DTSG argued that, as a result of First Bank's broken promises, DTSG was harmed and was seeking damages. DTSG described each of the nineteen promises as an agreement and asserted that DTSG suffered damages in various respects by relying on these promises. Yet, in discussing the liability question for negligent misrepresentation, DTSG's counsel stated that each of these broken promises also was a negligent misrepresentation and that First Bank had misrepresented that the loan was going to be funded. In its closing argument, DTSG did not distinguish between the breach-of-contract damages it was seeking and the negligent-misrepresentation damages it was seeking. Likewise, in closing argument Brumitt's counsel did not distinguish between First Bank's acts that allegedly constituted breaches of contract and First Bank's acts that allegedly constituted negligent misrepresentations, and Brumitt's counsel urged the same damage amount for both of Brumitt's claims.

DTSG argues on appeal that its negligent-misrepresentation claim does not relate to First Bank's failure to comply with any of the Letters, but rather to many false promises that First Bank made about its ability to close and fund the loan on a particular date. DTSG asserts that, because none of the Letters expressly state a closing or funding date for the loan, First Bank's false representations about its ability to close and fund the loan are not based on the contractual terms of the loan. But, the failure of the Letters to specify a closing or funding date does not mean that the date on which the loan would close or fund is outside the scope of the Letters; rather, in the absence of a specified time for performance in the Letters, the court will construe the Letters as implying a reasonable time for First Bank to perform. *See Hall v. Hall,*158 Tex. 95, 308 S.W.2d 12, 16 (Tex. 1957) (stating that

"[w]hen the parties omit an express stipulation as to time, it is in accord with human experience and accepted standards of law for us to assume that they meant whatever term of days or years might be reasonable in the light of the circumstances before them at the date of the contract"); *Metromarketing Services, Inc. v. HTT Headwear, Ltd.,* 15 S.W.3d 190, 195–96 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (stating that when the parties do not fix the time of performance, courts imply a reasonable time for performance).

In proffering evidence regarding the damages sustained by DTSG and Brumitt the claimants did not differentiate between economic losses suffered as a result of First Bank's failure to comply with its alleged contractual obligation to close and fund the loan and economic losses caused by First Bank's alleged negligent misrepresentations. DTSG claims that the independent injury it suffered from First Bank's alleged negligent misrepresentations was "the money it spent carrying out its growth strategy based on First Bank's representations regarding its ability to promptly close and fund the loan." But, the evidence of damages cited by DTSG does not establish any injury independent from economic losses recoverable under DTSG's breach-of-contract claims. DTSG did not ask the jury to assess damages based on this distinction, and the record does not reflect that the jury did so.[29]

DTSG and Brumitt both rely upon the Supreme Court of Texas's opinion in *Federal Land Bank Ass'n of Tyler v. Sloane* as support for their ability to pursue negligent-misrepresentation claims in addition to breach-of-contract claims. *See*

---

[29] The jury found the same amount of money as direct damages to DTSG for First Bank's failure to comply with one or more of the Letters and as damages to DTSG caused by First Bank's negligent misrepresentation.

41

825 S.W.2d 439, 440–43 (Tex. 1991). The *Sloane* court addressed whether the prospective borrowers' negligent-misrepresentation claims against a bank were barred by the statute-of-frauds requirement in section 26.01 of the Business and Commerce Code and whether the prospective borrowers could recover mental anguish or lost profits under these claims. *See id.* The prospective borrowers did not assert breach-of-contract claims or allege that the bank agreed to loan them money; rather, they alleged that the bank did not agree to loan them money yet negligently represented that the bank had made such an agreement. *See id.* at 442. The *Sloane* case is not on point. *See id.* at 440–43.

As a matter of law neither DTSG nor Brumitt showed an injury independent from economic losses recoverable under a breach-of-contract claim; accordingly, neither party may recover damages under the tort claim of negligent misrepresentation. *See D.S.A., Inc.*, 973 S.W.2d at 663–64; *Owen*, 2011 WL 3211081, at *8; *Esty, S.S.B.*, 298 S.W.3d at 301–02; *Cessna Aircraft Co. v. Aircraft Network, LLC*, 213 S.W.3d 455, 466–67 (Tex. App.—Dallas 2006, pet. denied). And, because DTSG and Brumitt are only entitled to recover under their respective breach-of-contract claims, they are not entitled to recover exemplary damages. *See D.S.A., Inc.*, 973 S.W.2d at 663–64. Therefore, we sustain First Bank's fourth issue.

I. **In First Bank's argument under the seventh issue, has First Bank shown that the trial court erred in rendering judgment in favor of Brumitt?**

In its seventh issue, First Bank asserts the testimony of Brumitt's damages expert, Anthony DeBenedictis, is unreliable and thus legally insufficient to support the jury's verdict regarding Brumitt's damages. Though First Bank does not specify any jury question in its argument, because we have sustained the fourth

issue, the only damages finding at issue would be the jury's damages finding as to Brumitt's breach-of-contract damages in response to question number five. Under its seventh issue, First Bank presents argument in support of the proposition that DeBenedictis's testimony is unreliable and conclusory and thus legally insufficient evidence of Brumitt's damages. First Bank asserts that, because DeBenedictis's testimony is legally insufficient, this court should reverse the trial court's judgment and render judgment that Brumitt take nothing. In essence, First Bank argues that the trial court erred in rendering judgment in Brumitt's favor because DeBenedictis's testimony is legally insufficient.

First Bank does not assert or present argument that (1) the trial evidence (which is voluminous) is legally insufficient to support a finding that Brumitt sustained any damages or to support any particular damage finding by the jury; (2) DeBenedictis's testimony is the only testimony at trial regarding Brumitt's damages; or (3) expert testimony was necessary to prove Brumitt's damages. Presuming, without deciding, that DeBenedictis's testimony is legally insufficient, we conclude that First Bank still has not shown that the trial court erred in rendering judgment in favor of Brumitt as to his breach-of-contract claim. *See Riggins v. Hill*, —S.W.3d.—, —, 2015 WL 293270, at *3 (Tex. App.—Houston [14th Dist.] Dec. 23, 2014, no pet. h.). Accordingly, we overrule First Bank's seventh issue.

### III. CONCLUSION

The trial court reversibly erred in allowing Brumitt's lead trial counsel to testify as an expert as to DTSG's attorney's fees. But, there is no merit in First Bank's challenges to the breach-of-contract claims of either DTSG or Brumitt. The trial court did not err in overruling First Bank's objection that no third-party-

beneficiary issue should be submitted to the jury because the third-party-beneficiary analysis is limited to the four corners of each of the Letters and because construction of the unambiguous Letters is a matter of law for the court. The trial evidence is legally sufficient to support a finding that First Bank and DTSG intended Brumitt to benefit from one or more of the Letters and to support the jury's finding in response to question four. Under the unambiguous language of section 26.02 of the Business and Commerce Code, this statute does not apply to any of the Letters.

As a matter of law, neither DTSG nor Brumitt showed an injury independent from economic losses recoverable under a breach-of-contract claim, so neither party may recover under the tort claim of negligent misrepresentation. Because DTSG and Brumitt are entitled to recover only under their respective breach-of-contract claims, they are not entitled to recover exemplary damages.[30]

Accordingly, we modify the trial court's judgment to delete (a) all recoveries of attorney's fees in favor of DTSG, and (b) all recoveries under the negligent-misrepresentation claims of DTSG and Brumitt, and (c) all exemplary damages. We affirm the trial court's judgment as modified.


/s/   Kem Thompson Frost
Chief Justice


Panel consists of Chief Justice Frost and Justices Donovan and Brown.

---

[30] Based on the disposition, we need not and do not address First Bank's fifth, tenth, and eleventh issues.